**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3331-18T1

B.G.,

     Plaintiff-Respondent,

v.

P.G.,

     Defendant-Appellant.

_____

Argued telephonically February 12, 2020 –
Decided March 12, 2020

Before Judges Nugent and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-2243-13.

Timothy John Dey argued the cause for appellant.

Robert D. Kovic argued the cause for respondent.

PER CURIAM

Defendant P.G.[1] appeals from the portion of a March 29, 2019 order of the Family Part denying his motion to vacate a January 17, 2018 consent order waiving his right to receive alimony while incarcerated. We vacate the portion of the order under review and remand for an evidentiary hearing.

I.

We are hampered in our recitation of the facts by P.G.'s failure to include in his appendix the certification he filed in support of his motion to vacate and by the trial court's disposition of P.G.'s motion without an evidentiary hearing. We glean the following facts from the record.

The parties were married in 1987. In 2014, the Family Part entered a final judgment of divorce incorporating a property settlement agreement (PSA) executed by the parties.[2] Pursuant to the PSA, plaintiff B.G. is to pay P.G. alimony of $2000 a month. The PSA allows for the cessation of alimony in five specified circumstances, not including P.G.'s incarceration. In addition, the agreement allows B.G. to seek a modification of her alimony obligation upon her retirement but mentions no other grounds for seeking a modification.

---

[1] We identify the parties by initials to protect P.G.'s medical privacy in accordance with Rule 1:38-3(d)(3).

[2] Although the PSA indicates it is thirty-three pages, P.G. included only thirty pages of the agreement in his appendix.

A-3331-18T1

P.G. is disabled because of mental health issues. He receives social security disability payments, a portion of which are provided directly to the couple's child as P.G.'s child support. The remainder of the payments are deposited into a bank account in P.G.'s name.

P.G. was incarcerated on January 20, 2017. B.G. unilaterally stopped making alimony payments on February 1, 2017.

An attorney acting on behalf of B.G. drafted a consent order suspending her alimony obligation while P.G. was incarcerated. The consent order provides the suspension of alimony is retroactive to February 1, 2017 and that P.G. would not seek retroactive reinstatement of any alimony payments withheld during his incarceration.

On October 10, 2017, the attorney mailed the draft consent order to P.G. at his prison address, requesting his signature on the consent order. On October 31, 2017, P.G. signed the consent order. P.G. returned the consent order to B.G., who signed it on January 2, 2018.

In January 2018, B.G. submitted the signed consent order to the trial court. The court entered the consent order on January 17, 2018.[3]

---

[3] Although the order is dated January 17, 2017, it is stamped by the court as filed on January 17, 2018.

A-3331-18T1

Shortly after his release from prison in December 2018, P.G. moved pursuant to Rule 4:50-1 to vacate the January 17, 2018 consent order. As far as we can discern from the record, P.G. argued the consent order is invalid because: (1) it was obtained through B.G.'s fraud, misrepresentation, or other misconduct, Rule 4:50-1(c); (2) he lacked the capacity to agree to the consent order, Rule 4:50-1(d); and (3) the consent order is inequitable, Rule 4:50-1(f). He sought a resumption of alimony and back alimony for the period of his incarceration in the amount of $44,660.[4] In addition, P.G. argued that while he was in prison, B.G. misappropriated approximately $27,500 from the bank account to which his social security payments were made. He sought recovery of those funds. B.G. opposed the motion.

The trial court decided the motion without an evidentiary hearing. The court found "[t]here is not a scintilla of information in" the certification P.G. submitted in support of his motion "that would persuade [it] to conclude that a hearing is necessary in this matter[,]" even if P.G.'s allegations are taken as true.

The court characterized the consent order as a settlement agreement, which "will not be lightly disturbed" but "enforced so long as the terms are fair and equitable." The court summarized P.G.'s argument as follows:

---

[4] B.G. voluntarily resumed alimony payments after P.G.'s release from prison.

[t]he defendant certifies that the plaintiff informed him that she was in dire financial circumstances. And he claims that she pressed him, taunted him, and threatened him and guilted him while he was incarcerated. He further certifies that plaintiff informed him that he was ineligible for alimony while he was incarcerated.

He described the difficulties that he experienced in prison, getting into fights and so on which resulted in him being confined to solitary confinement from March to July of 2017. He asserts that plaintiff began visiting after he was out of solitary and that during these visits she expressed her financial woes.

. . . .

But no[]where in his certification does he say that that occurred while he was provided with the consent order or that it was with any effort to coerce him to sign that consent order, just that she has an obsession with money.

The court rejected P.G.'s argument he was influenced by B.G.'s representation she consulted an attorney and that she believed P.G. was not entitled to alimony while in prison. The court found it was "inconsequential that the consent order was prepared by an attorney" and held P.G. "could have sought the advice of counsel prior to signing" the agreement, although it is unclear how he could have done so, given that B.G. unilaterally stopped paying alimony several months before she presented the consent order to P.G. and had also been misappropriating his social security disability payments.

5

In addition, the court found there was no evidence "of fraud, coercion, trickery, or any other basis upon which" to consider vacating the consent order. While recognizing B.G. had not applied for a reduction of alimony based on a change in circumstances, the court concluded without having taken any testimony that "[a]ll of plaintiff's day-to-day needs were being met by the State of New Jersey" during his incarceration and "he would have been receiving something of a windfall were the [c]ourt to impose the defendant to continue alimony [sic]." The court viewed the consent order as an "expeditious resolution" of what would likely have been a successful application by B.G. to suspend her alimony obligation and concluded there was nothing "unfair, unreasonabl[e, or] untoward in any way with respect to [the] consent order."

B.G.'s counsel acknowledged that she was obligated to return to P.G. the social security payments she took while he was incarcerated. The court noted although it "did not condone plaintiff's actions in . . . helping herself to [P.G.'s] bank account" while he was in prison, "her character has no bearing on the validity of the consent order."

On March 29, 2019, the court entered an order denying P.G.'s motion to vacate the January 17, 2018 consent order.

This appeal followed. P.G. raises the following arguments for our consideration:

POINT I

THE TRIAL COURT IGNORED N.J. COURT RULE 1:6-2 WHEN RULING ON AN UNOPPOSED MOTION WITHOUT A HEARING WITH ALL MOVANT'S FACTS UNCONTROVERTED.

POINT II

THE TRIAL COURT RULED WITHOUT REGARD TO THE STANDARDS FOR RELIEF AS PER NJ R. [SIC] 4:50-1.

POINT III

THE CONSENT ORDER SHOULD HAVE BEEN VACATED: THE UNPRECEDENTED INEQUITY TO DEFENDANT ARE [SIC] "EXCEPTIONAL CIRCUMSTANCES" VALIDATING VACATION.

POINT IV

DEFENDANT DID NOT HAVE THE CAPACITY TO UNDERSTAND THE "CONSENT ORDER"; THE TRIAL COURT MISSED THE LAW APPLYING R. 4:50-1 TO CONSENT ORDERS.

II.

Rule 4:50-1 provides, in relevant part:

[o]n motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for the

7

following reasons: . . . (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; . . . or (f) any other reason justifying relief from the operation of the judgment or order.

An application to set aside an order pursuant to Rule 4:50 is addressed to the motion judge's sound discretion, which should be guided by equitable principles. Hous. Auth. v. Little, 135 N.J. 274, 283 (1994). A trial court's determination under Rule 4:50-1 is entitled to substantial deference and will not be reversed in the absence of a clear abuse of discretion. US Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012). To warrant reversal of the court's order, P.G. must show that the decision was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Ibid. (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007) (internal quotations omitted)).

In determining whether a party should be relieved from a judgment or order, courts must balance "the strong interests in the finality of litigation and judicial economy with the equitable notion that justice should be done in every case." Jansson v. Fairleigh Dickinson Univ., 198 N.J. Super. 190, 193 (App. Div. 1985). Where a procedural violation is involved, additional considerations are implicated, namely, "'[t]he defendant's right to have the plaintiff comply

8

with procedural rules[, which] conflicts with the plaintiff's right to an adjudication of the controversy on the merits.'" Abtrax Pharms. v. Elkins-Sinn, 139 N.J. 499, 513 (1995) (quoting Zaccardi v. Becker, 88 N.J. 245, 252 (1982)). In all cases, however, "'justice is the polestar and our procedures must ever be moulded and applied with that in mind.'" Jansson, 198 N.J. Super. at 195 (quoting N.J. Highway Auth. v. Renner, 18 N.J. 485, 495 (1955)).

Relief under subsection (f) of Rule 4:50-1 is available only when "truly exceptional circumstances are present." Little, 135 N.J. at 286 (citation omitted). "The movant must demonstrate the circumstances are exceptional and enforcement of the judgment or order would be unjust, oppressive or inequitable." Johnson v. Johnson, 320 N.J. Super. 371, 378 (App. Div. 1999) (citation omitted).

Our review of the record reveals the trial court abused its discretion when it denied P.G.'s motion without holding an evidentiary hearing. P.G. raised a number of disputed factual issues that, if true, may constitute fraud, misrepresentation, or other misconduct by B.G. under Rule 4:50-1(c), render the consent order void for lack of consent by P.G. under Rule 4:50-1(d), or constitute exceptional circumstances warranting relief under Rule 4:50-1(f).

Primary among the disputed issues is P.G.'s contention he lacked legal capacity to agree to the consent order. It is undisputed P.G. receives disability payments due to mental health issues. In his brief, P.G. states he "has been on many psychotropic prescription medications" and was hospitalized after a suicide attempt. In addition, P.G. alleges that shortly after he began his incarceration, he was involved in an altercation resulting in his hospitalization and placement in solitary confinement. He alleges his six-month term in solitary confinement was reduced to four months because "prison doctors found he had become catatonic." According to P.G., B.G.'s prison visits began shortly after his release from solitary confinement.

These allegations, if true, raise questions with respect to whether P.G. had the capacity to agree to the suspension of alimony. We recognize that P.G.'s moving papers may not have specifically addressed his mental health or the circumstances immediately preceding execution of the consent order that may have caused a deterioration in his mental state. He argues, however, B.G. was aware of his mental health issues, which existed during the marriage. In addition, his counsel was prepared to present two witnesses at what he thought was a scheduled evidentiary hearing on P.G.'s motion. Those witnesses may

10

have been intended to illustrate why P.G. was susceptible to pressure to sign the consent order without understanding its terms.

P.G. also alleges when B.G. presented him with the consent order, he was not aware she had unilaterally stopped paying alimony and was misappropriating his disability payments. If P.G. had the capacity to agree to the consent order, his decision to do so may have been predicated on his belief B.G. was acting in good faith and that he could rely on the disability payments for support during and after his release from prison. These issues should be explored on remand. We note our disagreement with the trial court's conclusion that B.G.'s misappropriation of funds from P.G. is immaterial to the resolution of the motion because B.G.'s character is not at issue. B.G.'s behavior casts doubt on her credibility and is relevant to her state of mind, specifically whether she intended to take advantage of P.G.'s incarceration and, perhaps, his mental state, for her personal financial gain.

The proceedings on remand should also examine the effect, if any, on P.G. of B.G.'s representation that, after consulting an attorney, she believed he was not entitled to alimony while incarcerated. Our research did not reveal a statute or legal precedent which provides alimony is automatically suspended during the recipient's incarceration. If, as B.G. purportedly told P.G., she truly believed

11

she was entitled to suspend alimony payments upon his incarceration, she would not have needed to secure a consent order or his agreement to not seek retroactive reinstatement of alimony upon his release from prison. P.G.'s allegations raise the question of whether B.G.'s statement was based on incorrect legal advice or her misunderstanding of the law, or was an affirmative misrepresentation to avoid a motion for a modification of alimony, which would have triggered a hearing at which her unilateral cessation of alimony and misappropriation of P.G.'s disability payments would surely have come to light.

We also note our disagreement with the trial court's characterization of the consent order as a settlement agreement. There was no pending dispute between the parties when they signed the consent order. The consent order did not, therefore, settle any claims. In addition, there is an apparent lack of consideration to P.G. for executing the agreement. The consent order appears to benefit only B.G., the party whose counsel drafted it. The enforceability of the consent order is, therefore, in question.

The PSA, on the other hand, is a settlement agreement. That agreement specifies the circumstances in which the parties could seek modification of alimony and in which alimony terminated. P.G.'s incarceration is not included in those circumstances. On remand, the trial court shall consider the consent

12

order as a departure from the settlement agreement that resolved the parties divorce action and the equity of such a departure in light of what P.G. alleges is B.G.'s significant income.

To the extent we have not specifically addressed any of P.G.'s remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Vacated in part and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION